# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 1, 2005 Session

## STATE OF TENNESSEE v. KORIE BATES

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-12357, 02-07906      James C. Beasley, Jr., Judge**

---

**No. W2004-00686-CCA-R3-CD  - Filed May 20, 2005**

---

The defendant appeals his convictions for attempted second-degree murder and aggravated robbery. Specifically, he avers that, (1) the evidence was insufficient to support the verdicts; (2) the State's failure to disclose the statement of an unindicted co-conspirator constitutes a <u>Brady</u> violation and entitles him to a new trial; (3) the sentence was issued in error, in light of <u>Blakely v. Washington</u>; and (4) the cumulative effect of all errors merits a new trial. Following our review, we affirm the convictions and the sentences imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN, J., and JOE H. WALKER, SP. J., joined.

C. Anne Tipton, Memphis, Tennessee (on appeal), and Robert Wilson Jones, District Public Defender, and Phyllis Aluko and Kindle Nance, Assistant Public Defenders (at trial), for the appellant, Korie Bates.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

<u>Facts and Procedural History</u>

On October 17, 2000, the defendant, Korie Bates, was indicted on one count of criminal attempt first degree murder (a Class A felony). On October 8, 2002, a second indictment was returned, which charged the defendant with one count of especially aggravated robbery (a Class A felony). A jury convicted the defendant of criminal attempt second degree murder (a Class B felony) and aggravated robbery (a Class B felony), both lesser included offenses of those charged in the indictments. Following a hearing, the defendant was sentenced, as a Range I, standard offender, to

nine and eleven years on the charges, respectively. The sentences were ordered to run consecutively for a total effective sentence of twenty years. The defendant now appeals to this Court contending that: (1) the evidence was insufficient to support the verdicts; (2) the State's failure to disclose the statement of an unindicted co-conspirator constitutes a Brady violation and entitles him to a new trial; (3) the sentence was issued in error, in light of Blakely v. Washington; and (4) the cumulative effect of all errors merits a new trial.

Taken in a light most favorable to the State, the record reflects that Earnest Young ("Young") recruited the defendant and three other comrades to travel from Blytheville, Arkansas, to Memphis, Tennessee, to collect a drug-related debt owed by John Kerr ("Kerr") to Young. Specifically, Young instructed the defendant, Tyrone Brown ("Brown"), and Byron Washington ("Washington") to follow him and Johnny Wright ("Wright") as they traveled to Memphis.[1]

After arriving in Memphis, Wright and Young pulled off of the road, and Brown guided Washington to the street where Kerr's apartment complex was located. Washington parked Young's truck at a nearby market, and the trio walked to Kerr's apartment. Upon arriving, they found Kerr outside drinking a beer and began a conversation with him.[2] At some point, the subject turned to the money owed by Kerr to Young and their intention of collecting the debt. Kerr then invited the men inside to "talk about it." After Kerr denied having the money, the defendant and Brown drew weapons and began to search the apartment, without objection from Kerr.

One of the three men walked into the master bedroom of the apartment where Kerr's girlfriend, Andrea Allen ("Allen"), was sleeping. She awakened to find the man going through drawers and repeatedly asking, "Where is it?" The individual then forced her to get out of bed while he "snatched the mattress" and searched under it. Allen described the first person who entered the bedroom as wearing a camouflaged fishing hat, a t-shirt with "animation on the front," and jeans.

Several minutes later, a second man, later identified by Allen as Washington,[3] entered the bedroom. The second man picked up a box and asked Allen what it was, to which she replied that it was "a tool box." The second man left and re-entered the room, this time picking up a briefcase and inquiring as to its contents. After Allen responded that the briefcase held Kerr's military discharge papers and some pictures, the man carried the briefcase out of the bedroom. Moments later, Allen heard Kerr's voice, and the first man left the bedroom. Shortly thereafter, Allen heard a gunshot. A third man then came to the door of the bedroom and fired three shots at Allen, and all three men left the apartment.

After lying on the floor for a few minutes, Allen got up and instructed the babysitters, who were sleeping in the second bedroom with her children, to call the police. However, when they

---

[1] The record reflects that Young and Wright led in Wright's car, while the defendant, Brown, and Washington followed in Young's truck.

[2] The record reflects that Kerr and the three men were acquainted with one another, as Kerr had recently moved from Blytheville to Memphis.

[3] The transcript reveals that Allen recognized Washington "from around town" and from his attending school with Allen's brothers in Blytheville, Arkansas.

attempted to place the call, they discovered that the phone receivers had been removed from the apartment. They then ran to a neighboring apartment to contact authorities.

In the meantime, the defendant, Brown, and Washington returned to the truck and headed back to Blytheville. Washington testified at trial that the defendant took the phone receivers from Kerr's apartment and threw them out of the truck after they left the complex. He further stated that the defendant disposed of both weapons by throwing them into the Mississippi River as they crossed over the bridge from Memphis into Arkansas. Washington testified that Wright and Young eventually caught up to the truck on the interstate, and the five caravanned back to Blytheville and met at Washington's apartment. Although Wright left shortly after they arrived, the others remained at the apartment to discuss what had occurred in Memphis.

As a result of the events of that evening, John Kerr was fatally injured and Allen was treated for gunshot wounds to the left elbow, left leg, and lower left back. She was later released. The defendant was indicted for attempted first degree murder as to Allen and especially aggravated robbery as to Kerr. Following a jury trial, the defendant was convicted of the lesser included offenses of attempted second degree murder and aggravated robbery.[4] He was sentenced to nine and eleven years on the charges, respectively.

## Analysis

### I. Sufficiency

Initially, the defendant alleges that the corroborating evidence provided by Washington, an indicted co-defendant, was insufficient to identify him as being connected with the charged offense. In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Furthermore, accomplices cannot corroborate each other. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). In order to qualify as corroborative evidence:

> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted).

The corroborative evidence may be direct or circumstantial and is not required to be sufficient, standing alone, to support a conviction. Id. The corroborative evidence is sufficient if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

---

[4] It appears that the defendant was convicted based on a theory of criminal responsibility.

State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). In addition, corroboration is sufficient even though the evidence is slight and entitled, when standing alone, to but little consideration. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). The corroboration need not extend to all portions of the accomplice's evidence. Bigbee, 885 S.W.2d at 803. The sufficiency of the corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903.

Second degree murder is defined, in pertinent part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2004). Moreover, the inchoate offense of attempt is codified at Tennessee Code Annotated section 39-12-101 and states:

> (a)    A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1)    Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2004). Therefore, attempted second degree murder requires proof of: (1) a knowing, (2) attempt, (3) to kill another. State v. Rush, 50 S.W.3d 424, 430 (Tenn. 2001) (citations omitted).

Further, aggravated robbery is defined as a robbery "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402 (2004).

In the present case, Washington testified that he went to Memphis in June of 1999, to collect a debt from John Kerr on behalf of Earnest Young. Upon arriving in Memphis, Washington stated that he, Brown, and the defendant parked at a nearby fish market and walked to Kerr's apartment. Washington further testified that Brown and the defendant searched the apartment and that Brown opened Kerr's briefcase with a knife and spoon. He stated that when Brown shook the briefcase, Kerr "lunged at" Brown and the defendant, and it appeared that both men fired shots at Kerr. As Washington fled the apartment, he heard two to three more shots but was unable to determine their source.

Washington testified that, after returning to the truck, the three began to travel in the direction of Blytheville and that the defendant threw from the truck window two phone receivers he had taken

from the apartment. Washington also stated that the defendant disposed of the weapons, throwing them into the Mississippi River as they traveled over the bridge from Memphis into Arkansas.

At trial, Washington refreshed his recollection with a statement given to police shortly after the incident. After reviewing the statement, he testified that, on the night of the subject incident, the defendant wore "[a] black t-shirt, a pair of blue jeans and a camouflage fishing hat or hunting hat." He further described the hat as "a fishing hat but the visor comes all the way around the head, makes a complete circle around with a drawstring. You can tie it up if you want to."

Washington's testimony was corroborated by Allen, who stated that the first person to come into the bedroom "[had] on a fisherman's hat and it was like a wide brim but it was camouflage[d] and it was pulled down to right up in here. And a t-shirt of some sort with something, animation on the front, and some jeans or something." She further testified that when she told the babysitters to call the police, they informed her that the phone receivers were missing. Latrice Golden, one of the babysitters that night, corroborated the testimony that the phone receivers had been removed from the apartment.

We conclude that the corroboration evidence was sufficient to fairly and legitimately connect the defendant to the conviction offenses. Both Washington and Allen testified as to the unique hat worn by defendant that night. Further, although Allen was unable to positively identify the defendant following the incident, she indicated at trial that the defendant's physical characteristics matched those of the first intruder. Moreover, Washington, Allen, and Golden testified to the fact that the phone receivers were removed from the house. Finally, Washington indicated that these receivers were taken from the apartment and disposed of by the defendant. Therefore, we conclude that the evidence presented was sufficient to support the convictions.

## II. Brady Violation

Next, the defendant alleges that the State violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it failed to disclose the statement given to police by Wright, an unindicted co-conspirator. In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; see also Sample v. State, 82 S.W.3d 267, 270 (Tenn. 2002). The duty to disclose extends to all "favorable information," regardless of whether the evidence is admissible at trial. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). In United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule.

However, the State is not required to disclose information the defendant already possesses or is able to obtain. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Nor is the State required to disclose information that is not possessed by or under the control of the prosecution or other governmental agency. Id.

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See Bagley, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); Edgin, 902 S.W.2d at 389.

In order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566; see also Strickler v. Greene, 527 U.S. 263, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286 (1999). The Court in Kyles urged that the cumulative effect of the suppressed evidence be considered to determine materiality. Kyles, 514 U.S. at 436, 115 S. Ct. at 1567.

Upon review of the statement in question, we conclude that its nondisclosure does not violate Brady because it is neither favorable to the defendant nor material. Taking the issues in order, we first note that our supreme court has held that "the Brady obligation comprehends evidence which provides some *significant aid* to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material**,** although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)) (emphasis added). At the motion for new trial, the trial court found that:

> [T]here's nothing in [the statement] that's inconsistent with anything that I have seen or heard in the trial.
>
> And, so, this Court would find that it does not contain anything exculpatory as to [the defendant], and that there's not anything, in this court's opinion, that would have – had Mr. Wright been brought in to testify based on this statement, that would have exculpated [the defendant's] role in this case. In fact, if I'm not mistaken, I believe I read in here where it was the – that [Wright] even indicated that [Washington] was not supposed to have gone inside, that [the defendant] and the other guy was the ones that were supposed to have gone inside and roughed up [Kerr].

We agree with the findings of the trial court. Contrary to the defendant's argument that the statement provides a "significantly different version of the facts" than that given by Washington at trial, it appears that the two agree on all pertinent points. The statement confirms that Young recruited Wright to drive him to Memphis, accompanied by Washington, Brown, and the defendant. The statement further corroborates Washington's testimony that, once in Memphis, Wright waited in his vehicle with Young and had no knowledge of what transpired in Kerr's apartment. Finally, the

-6-

statement indicates that, after seeing Washington, Brown, and the defendant traveling in the truck approximately thirty minutes later, Wright and Young followed them back to Blytheville.

We initially note that Wright's statement provides no information to support the assertion that the defendant did not enter Kerr's apartment on the night in question. Rather, it corroborates the State's proof that, after separating from Brown, Washington, and the defendant, Wright and Young did not see the others again until they left Kerr's apartment on their way back to Blytheville. Moreover, the statement indicates that the defendant's presence and his role in the incident were intended and planned by Young. Specifically, the statement reveals that Young intended for Washington to remain in the truck while Brown and the defendant "[got] what [Kerr] had left and beat him up." Washington corroborated this statement at trial when he acknowledged that he was supposed to drive to Kerr's apartment and stay in the truck while Brown and the defendant went inside.

Finally, the statement would not be a significant aid to impeach Washington. As previously mentioned, the statement corroborates the pertinent points of Washington's trial testimony; therefore, any discrepancies would be minor and would aid the defendant only marginally, if at all. We see no possible way in which this statement could render significant aid to the defendant, either to exculpate his role in the offense or to impeach Washington.

We further conclude that the materiality requirement has not been fulfilled. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Although the State's cases reference the term "probability," the true determination to be made is whether "the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'" Johnson, 38 S.W.3d at 58 (quoting Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (internal citations omitted)).

As we have previously noted, the statement given by Wright merely confirmed and corroborated the State's proof of the pertinent facts. Therefore, if disclosed, it would not have presented any previously unknown or novel fact that would have changed the complexion of the case. As such, we conclude that its disclosure certainly would not have altered the case in such a way as to undermine the verdict as it stands. Therefore, the requisite element of materiality has not been proven.

## III. Sentencing

The defendant also challenges the sentences imposed in light of the Supreme Court's recent holding in Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004). However, in a recent opinion, our supreme court held that Blakely does not apply to our sentencing act. See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R11-CD, 2005 Tenn. LEXIS 350 (Tenn., at Knoxville, April 15, 2005). Therefore, this argument is without merit.

The defendant also challenges the imposition of consecutive sentences. Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria applies:

(1)    [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2)    [t]he defendant is an offender whose record of criminal activity is extensive;

(3)    [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)    [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)    [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

If the court concludes the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are unnecessary for the other categories of Tennessee Code Annotated section 40-35-115(b). State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In the present case, the defendant contends that imposing a consecutive sentence based upon subsection (b)(4) violates the holding of Blakely. We first note that both our supreme court and this Court have previously addressed the applicability of Blakely and Apprendi to consecutive sentencing. In so doing, our courts have held, in harmony with other jurisdictions, that these cases

-8-

do not affect the trial court's ability to order consecutive sentencing. See State v. Robinson, 146 S.W.3d 469, 499 n. 14 (Tenn. 2004) (citations omitted) (noting that "several courts" have rejected the contention that Blakely and Apprendi apply to the decision to impose consecutive sentencing); State v. Howard Walter Thomas, No. E2003-02090-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 300, at *98-99 (Tenn. Crim. App., at Knoxville, Mar. 30, 2005) (rejecting Blakely contention as applied to consecutive sentencing based on subsection (b)(4)). Therefore, we repeat the holdings of the previous decisions and reject this contention.

Next, we address whether the trial court properly found that the defendant was an appropriate candidate for consecutive sentences under subsection (b)(4). In determining the propriety of consecutive sentences, the trial court opined:

> The Court has reviewed the statute with regard to those particular factors, and the Court again in reviewing not only the statute but the case law. Cases tell us that:
>
>> "The defendant may not to [sic] be required to serve multiple sentences consecutively on the ground he is a dangerous offender unless the record establishes that the defendant's behavior indicated little or no regard for human life and that he did not hesitate about committing a crime in which the risk to human life was high.
>>
>> "The circumstances surrounding the commission of the offense were aggravated. The confinement for an extended period of time is necessary to protect society and that the aggregate length of the sentence in consecutive sentencing is ordered, reasonably relates to the offenses for which the defendant stands convicted."
>
> In this case, again, as I would state, I have one man who is dead, one woman who was mortally wounded, all to recover drugs and drug money. That's the whole purpose of this. They felt that Mr. Kerr had stolen their drugs and stolen their money, and they sent them over here a little bit of self-help repossession I guess is what you'd call it, and in the course of that, they took a man's life and mortally wounded his wife.
>
> This Court find that those actions meet the criteria set out in the case law and meet the criteria set out in the statute for consecutive sentencing. I do find that [the defendant] is a dangerous offender whose behavior indicates little or no regard for human life and that had no hesitation about committing this crime in which the risk to human life was high, and I'll order that the sentences be served consecutively.

Upon reviewing the trial court's findings at the sentencing hearing, we conclude that the court properly found that the defendant met the requirements of (b)(4) and was an appropriate candidate for consecutive sentencing. The record reflects that the trial court recited the requisite factors,

expounded on the details of the offense, and found that the defendant met the necessary criteria to be sentenced consecutively.

## IV. Cumulative Error

Finally, the defendant contends that the cumulative effect of all errors merits a new trial. Initially, we note that the defendant has waived this argument for failure to raise it in his motion for new trial. Tenn. R. App. P. 3(e). Further, as we have found no individual error as to the convictions, this argument is without merit.

## Conclusion

The defendant's convictions and sentences are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE